IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ARTHUR L. HAIRSTON, SR., | HON. JEROME B. SIMANDLE |
| Plaintiff, | Civil No. 06-4894 (JBS) |
| v. | |
| CHARLES SAMUELS, | **OPINION** |
| Defendant. | |

APPEARANCES:

Mr. Arthur L. Hairston, Sr.
#03705-087
F.C.I. Fort Dix
P.O. Box 38
Fort Dix, NJ 08640
    Plaintiff pro se

Christopher J. Christie
UNITED STATES ATTORNEY
    By:  J. Andrew Ruymann
         Assistant United States Attorney
402 East State St., Room 430
Trenton, NJ 08608
    Attorney for Defendant Charles Samuels

**SIMANDLE**, District Judge:

Plaintiff Arthur L. Hairston, Sr. ("Plaintiff" or "Mr.

Hairston"), an inmate at the Federal Correctional Institution at

Fort Dix, New Jersey ("F.C.I. Fort Dix"), brings this action

pursuant to 28 U.S.C. § 1331 and under the authority of Bivens v.

Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S.

388 (1971), for civil damages against the defendant, Charles

Samuels ("Defendant" or "Mr. Samuels"), the former warden of

F.C.I. Fort Dix.  Plaintiff alleges that the Defendant violated

his First Amendment rights to privacy and to petition the courts

for legal redress by instituting a policy at F.C.I. Fort Dix that

required all inmates to turn over outgoing special mail[1] to a

unit team member for further processing.  Presently before the

Court is Defendant's motion to dismiss and/or for summary

judgment [Docket Item 25].  For the following reasons, the Court

will grant Defendant's motion for summary judgment.

## I. BACKGROUND

### A.    Facts

At issue in this case is the procedure for collection of

special mail from inmates put into place by the Defendant in his

capacity as warden of F.C.I. Fort Dix.  (Am. Compl. ¶ 3(3).)

On February 16, 2006, the Defendant issued a memorandum to

his staff and inmates at F.C.I. Fort Dix eliminating the "special

mail drop-box" and establishing a procedure whereby "all special

mail for general population inmates must be hand delivered to a

unit team staff member for further processing."  (Decl. of J.

Andrew Ruymann, Ex. 2.)  This memo was issued in response to a

---

[1] "Special mail" is defined under the applicable federal
regulations as general correspondence from a prisoner to a
government entity, including to "U.S. Attorneys Offices . . .
U.S. Courts" and "Members of the U.S. Congress."  28 C.F.R. §
540.2(c).  All legal mail (i.e. correspondence between a prisoner
and his own attorney) is handled in the same manner as special
mail.  Id. § 540.19(b).

February 1, 2006 memorandum from John M. Vanyun, Assistant
Director of the Correctional Programs Division for the Federal
Bureau of Prisons, to the regional directors of the Bureau.  (Id.
at Ex. 3.)  The memo from Mr. Vanyun mandated the same procedures
that the Mr. Samuels set forth in his later memo.  (Id.)  Mr.
Vanyun's memo simply elaborated on the details and reasons for
the procedures.  (Id.)  As a result of the procedures established
by Mr. Samuels' memo, the special mail box was removed from the
premises at F.C.I. Fort Dix and all prisoners were required to
submit their special mail to unit team personnel.  (Am. Compl. ¶
3(3).)

     According to the Amended Complaint, the policy promulgated
by the Defendant requires the Plaintiff to wait until 3:30 p.m.
every day to hand over any special mail to the unit team leaders,
a restriction that the Plaintiff has characterized as "a
nightmare and very challenging."  (Id.)  According to Mr.
Hairston, this restriction has caused him to feel that he
"doesn't even want to deal with the unreasonable situation of
having to wait until 3:30 throughout the week to mail properly
marked legal mail, special inmates grievances through a partial
[u]nit [t]eam."  (Id. ¶ 3(6).)

     Plaintiff states that the policy described above varies to a
great degree from the previous policy in existence at F.C.I. Fort
Dix and throughout the Federal Bureau of Prisons ("B.O.P.") of

allowing inmates to place special mail at any time of day in a

separate mailbox specifically set up for that purpose.  (Id. ¶

3(3).)  The Plaintiff urges that this previous policy allowed

inmates to "drop properly marked legal mail in the [b]ox and not

have to be subjected to the unit team[']s unprofessional

conduct."  (Id.)

**B.    Procedural History**

Plaintiff filed a Complaint in the instant case on October

12, 2006 and filed an Amended Complaint on July 11, 2007 [Docket

Item 7].  The Plaintiff did not complete service on the United

States as required under Rule 4(i) of the Federal Rules of Civil

Procedure until January 2, 2008 [Docket Item 18].  The Defendant

filed the motion at issue in this case in lieu of an Answer, to

the merits of which the Court now turns[2] [Docket Item 25].

**II. DISCUSSION**

**A.    Standard of Review**

Summary judgment is appropriate when the materials of record

"show that there is no genuine issue as to any material fact and

---

[2] Allegations by Mr. Hairston that the Defendant did not
timely file this motion are without merit [Docket Item 26, ¶ 3].
Under Local Rule 6.1(b), the Defendant received an automatic
fifteen-day extension of the deadline to answer the Amended
Complaint from the Clerk of the Court on March 3, 2008, the last
day of the sixty-day response period mandated by Rule 12(a)(2)
and calculated under Rule 6(a) of the Federal Rules of Civil
Procedure [Docket Item 24].  Exactly fifteen days later, on March
18, 2008, the Defendant filed his motion to dismiss or for
summary judgment [Docket Item 25].

that the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(c).  In deciding whether there is a disputed

issue of material fact, the court must view the evidence in favor

of the non-moving party by extending any reasonable favorable

inference to that party; in other words, "the nonmoving party's

evidence 'is to be believed, and all justifiable inferences are

to be drawn in [that party's] favor.'"  Hunt v. Cromartie, 526

U.S. 541, 552 (1999) (quoting Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 255 (1986)).  The threshold inquiry is whether

there are "any genuine factual issues that properly can be

resolved only by a finder of fact because they may reasonably be

resolved in favor of either party."  Liberty Lobby, 477 U.S. at

250; Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326,

329-30 (3d Cir. 1995) (citation omitted).

Although entitled to the benefit of all justifiable

inferences from the evidence, "the nonmoving party may not, in

the face of a showing of a lack of a genuine issue, withstand

summary judgment by resting on mere allegations or denials in the

pleadings; rather, that party must set forth 'specific facts

showing that there is a genuine issue for trial,' else summary

judgment, 'if appropriate,' will be entered."  United States v.

Premises Known as 717 South Woodward Street, Allentown, Pa., 2

F.3d 529, 533 (3d Cir. 1993) (quoting Fed. R. Civ. P. 56(e))

(citations omitted).  As the Supreme Court has explained,

> Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.   In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (internal quotations and citations omitted).

**B.   Analysis**

Under Third Circuit precedent, a violation of an individual's First Amendment rights by a federal officer gives rise to the same private civil action for damages as allowed by the Supreme Court for a violation of Fourth Amendment rights by a federal officer. Paton v. LaPrade, 524 F.2d 862, 869-70 (3d Cir. 1975) (extending a Bivens action to include violations of the First Amendment).  As a result, the current case, in which the Plaintiff argues a violation of his First Amendment right to freedom of speech and to petition the court for redress of grievances, will be analyzed under the same framework as established in Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971), including the application of the Defendant's claim of qualified immunity from suit.

The Defendant has moved in this case for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure or in the alternative for summary judgment as a matter of law under Rule

56(c) of the Federal Rules of Civil Procedure [Docket Item 25].

As set forth more fully below, the Court now grants the

Defendant's motion for summary judgment on the basis of qualified

immunity.

    1.   Qualified Immunity Standard

    Qualified immunity is a threshold issue that could result in

immunity from suit and thus should be undertaken at the earliest

possible point in the proceedings.  As the Third Circuit has

recognized, "the Supreme Court has instructed that '[i]mmunity

ordinarily should be decided by the court long before trial.'"

Curly v. Klem, 499 F.3d 199, 208 (3d Cir. 2007)(quoting Hunter v.

Bryant, 502 U.S. 224, 228 (1991)).  As an "accommodation of

competing values," qualified immunity strikes a balance by

permitting a plaintiff to recover for constitutional violations

where the defendant officer was "plainly incompetent or . . .

knowingly violate[d] the law," while immunizing an officer who

"made a reasonable mistake about the legal constraints on his

actions."  Curley, 499 F.3d at 206-07 (internal quotations and

citations omitted).

    In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court

described the two-step inquiry courts undertake in determining

whether a governmental officer is entitled to qualified immunity.

First, the Court must address whether "the officer's conduct

violated a constitutional right."  Id. at 201.  As the Court of

Appeals noted in Curley, this is "not a question of immunity at
all, but is instead the underlying question of whether there is
even a wrong to be addressed in an analysis of immunity."
Curley, 499 F.3d at 207.  If in this first step the Court finds
that there was no constitutional violation, "there is no
necessity for further inquiries concerning qualified immunity."
Saucier, 533 U.S. at 201.

    "'If, and only if, the court finds a violation of a
constitutional right,' the court moves to the second step of the
analysis and asks whether immunity should nevertheless shield the
officer from liability."  Curley, 499 F.3d at 207 (quoting Scott
v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 1774 (2007)).  The
inquiry under this second step addresses whether "the right was
clearly established."  Saucier, 533 U.S. at 201.  The analysis of
whether the right was clearly established "must be undertaken in
light of the specific context of the case, not as a broad general
proposition," in order to assess "whether it would be clear to a
reasonable officer that his conduct was unlawful in the situation
he confronted."  Id. at 201-02.

                2.    Analysis of Constitutional Rights

    The Court first addresses "whether the officer's conduct
violated a constitutional right."  Saucier, 533 U.S. at 201.  The
First Amendment to the United States Constitution states that
"Congress shall make no law . . . abridging the freedom of speech

or . . . the right of the people . . . to petition the Government

for redress of grievances."  U.S. Const. amend. I.  The Supreme

Court has recognized that the First Amendment provides a related

right for "access of prisoners to the courts for the purpose of

presenting their complaints."  Johnson v. Avery, 393 U.S. 483,

485 (1969).  This right of access "must be 'adquate, effective

and meaningful,' and must be freely exercisable without

hinderance or fear of retaliation."  Milhouse v. Carlson, 652

F.2d 371, 374 (3d Cir. 1981) (quoting Bounds v. Smith, 430 U.S.

817, 822 (1977)) (internal citation omitted).

The Supreme Court developed a two-prong test for determining

if a policy censoring the outgoing mail of a prisoner at a

particular institution violates the First Amendment guarantee in

Procunier v. Martinez, 416 U.S. 396, 413 (1974).  See also

Thornburgh v. Abbott, 490 U.S. 401, 413 (1989) (limiting the test

in Martinez only to outgoing prisoner mail).  In Martinez, the

Supreme Court ruled that any censorship of outgoing inmate

correspondence will only be allowed if it "further[s] an

important or substantial government interest unrelated to the

suppression of expression" and is "no greater than is necessary

or essential to the protection of the particular government

interest involved."  Martinez, 416 U.S. at 413.  However, the

Supreme Court has also required that prison officials "be

accorded wide-ranging deference in the adoption and execution of

policies and practices that in their judgment are needed to

preserve internal order and discipline and to maintain

institutional security."  Bell v. Wolfish, 441 U.S. 520, 547

(1979).  In relating Martinez to the series of cases that

includes Bell, the Supreme Court has indicated that:

> prison officials may well conclude that certain proposed
> interactions, though seemingly innocuous to laymen, have
> potentially significant implications for the order and
> security of the prison.  Acknowledging the expertise of
> these officials and that the judiciary is "ill equipped"
> to deal with the difficult and delicate problems of
> prison management, this Court has afforded considerable
> deference to the determinations of prison administrators
> who, in the interest of security, regulate the relations
> between prisoners and the outside world.

Thornburgh, 490 U.S. at 407-08.

In this case, the procedures put into place by Mr. Samuels

at F.C.I. Fort Dix were based on a memo from John M. Vanyun

mandating that all institutions within the B.O.P. eliminate

special mail "drop-boxes" and establish procedures for unit staff

to collect special mail from inmates.  (Decl. of J. Andrew

Ruymann, Ex. 3.)  In that memo, Mr. Vanyun details the reason for

the change in policy as "promptly reduc[ing] the likelihood that

inmates will successfully send harmful materials to persons in

the community by exploiting the privacy afforded outgoing special

mail."  (Id.)  The procedures established by the memo require

confirming "that the inmate delivering [the special mail item] is

the same inmate reflected in the return address" and

electronically scanning the items "for the sole purpose of

identifying harmful materials."  (Id.)

The memo states that "the private nature of outgoing special mail communication will not be compromised."  (Id.)  To that end, Mr. Vanyun's procedures allow that "[i]nmates may still seal their outgoing special mail before submitting directly to staff for further processing" and that electronic scanning "cannot be used to read or review the content of outgoing special mail communication."  (Id.)  The memo further establishes that special mail confiscated because of the presence of harmful materials or because of an incorrect return address, "should not be read by staff, and . . . [w]henever possible . . . should be returned to the inmate for re-sending."  (Id.)

Defendant's memo was not as detailed as Mr. Vanyun's, but it had similar content.  (Decl. of J. Andrew Ruymann, Ex. 2.)  The procedures established by Mr. Samuels eliminated the special mail drop-box and required inmates to deliver such items to a unit team staff member. (Id.)  Mr. Samuels also noted that any special mail delivered to unit staff "without [an] accurate return address will not be further processed and will be immediately returned."  (Id.)  Finally, Mr. Samuels stated that if an inmate attempts to send special mail under another inmate's return address or if the electronic scan of special mail confirms the presence of "harmful contraband" then the "inmate may face disciplinary action or criminal charges."  (Id.)

11

These procedures clearly meet the test as established in

Martinez.[3]  In that decision the Supreme Court detailed the

possible substantial government interests that could excuse

censorship of outgoing prisoner mail as, "security, order and

rehabilitation."  Martinez 416 U.S. at 413.  The Supreme Court in

exploring the boundaries of Martinez has indicated that

"[d]angerous outgoing correspondence is more likely to fall

within readily identifiable categories: examples ... include

escape plans, plans relating to ongoing criminal activity, and

threats of blackmail or extortion."  Thornburgh, 490 U.S. at 412.

The Third Circuit expanded upon this ruling by noting that,

"[a]dded to these risks are the possibility that such mail could

---

[3]  Mr. Hairston alleges in his Amended Complaint that the
Defendant's policy of requiring all inmates to deliver special
mail to unit team personnel has resulted in him being taunted by
prison staff with questions about the content of his outgoing
special mail.  (Amend. Compl. at  ¶ 3(3).)  He has indicated that
these statements, along with a perceived conflict of interest by
unit team personnel handling special mail correspondence
containing inmate grievances, has resulted in Plaintiff "not
wanting to even take properly marked mail to the same [u]nit
[s]taff where there is a conflict of interest."  (Id. ¶ 3(4).)
    These allegations target the actions of officers who are not
defendants in the current case.  Nothing in the allegations
suggest any personal involvement by Mr. Samuels in the actions of
those officers.  Nor has the Plaintiff adduced any evidence of
the Defendant's personal involvement in the actions of the
officers.  Neither can the Defendant be held responsible for the
actions of these unnamed officers under a theory of respondeat
superior liability.  See, e.g., Ruiz Rivera v. Riley, 209 F.3d
24, 28 (1st Cir. 2000) (citing cases from Circuit Courts holding
that respondeat superior is not a viable theory of Bivens
liability).  See also Huberty v. U.S. Ambassador to Costa Rica,
No. 07-4330, 2008 WL 3864073 at *1 (3d Cir. 2008).

be used to facilitate the introduction of contraband into the prison, or the conducting of a business prohibited by prison regulations.  The specific threats to security identified by Thornburgh constitute an important and substantial government interest."  Nasir v. Morgan, 350 F.3d 366, 374 (3d Cir. 2003).

The stated intent of the newly established procedures is to prevent inmates from using the confidentiality of special mail to send harmful materials to members of the community.  This interest in preventing inmates from sending harmful correspondence has been recognized as an important government interest under Martinez.  See, e.g., Witherow v. Paff, 52 F.3d 264, 266 (9th Cir. 1995) (per curiam) ("Preventing prisoners from disseminating offensive or harmful materials clearly advances the orderly administration of prisons, the rehabilitation of prisoners, and the security of those receiving the materials."); Johnson v. Pacholski, No. 07-633, 2007 WL 1751745 at *9 (D.N.J. June 14, 2007)("Prison officials have 'broad discretion' in monitoring inmate correspondence to ensure that the inmates are not 'passing contraband' or 'making clearly inappropriate comments, which may be expected to circulate among prisoners.'") (quoting Shaw v. Murphy, 532 U.S. 223, 231 (2001)).

Additionally, the method by which the B.O.P. has decided to enforce this important government objective (i.e. allowing unit staff members to confirm the return addresses of correspondence

and mandating the electronic scanning of sealed mail items for harmful materials) is minimally intrusive to the privacy afforded the inmate.  In fact, under these procedures, staff members are prohibited from reading the contents of any special mail and nearly every refusal to process special mail results not in a censorship of the mail but in a return of that mail to the inmate to allow him to comply with the regulations and re-send it.  See Wolff v. McDowell, 418 U.S. 539, 576 (1974) (finding that "freedom from censorship is not equivalent to freedom from inspection or perusal"); Altizer v. Deeds, 191 F.3d 540, 548 (4th Cir. 1999) ("Martinez . . . involved the 'censorship' of inmate mail, not the 'inspection' of inmate mail."); Witherow, 52 F.3d at 265-66. (finding no First Amendment violation where a Nevada state prison regulation required unit staff to examine unsealed outgoing special mail and confirm the return address of the inmate before the inmate is allowed to seal and send that mail).

It bears noting that the mail policy at issue in this case is less restrictive and more narrowly tailored than the policies that courts have upheld as being consistent with the First Amendment and Martinez.  For example, the policy upheld by the Ninth Circuit in Witherow required that a letter to a public official be presented to the unit officer unsealed so that officer might examine the contents of the envelope, check the validity of the return address and then return it to the inmate

14

to be sealed and sent.  Witherow, 52 F.3d at 266.  Mr. Samuels'

policy achieves the same result, but by allowing the inmate to

seal the envelope before handing it over to the unit officer and

only requiring the letter to be electronically scanned for

harmful materials, it completely removes the potential that a

unit officer might improperly read the contents of the letter;

the policy herein thus gives the inmate an even greater amount of

privacy in his mail than the policy upheld in Witherow did.

    Similarly, the policy approved by the Fourth Circuit in

Altizer allowed a warden to require the opening and inspection of

all outgoing mail from inmates.[4]  The Fourth Circuit drew the

distinction between inspecting the mail for removal of dangerous

material and censoring the mail.  The court there indicated that

opening and inspecting mail does not rise to the level of

constitutional violation that would even require a Martinez-type

analysis.  Altizer, 191 F.3d at 547-48.  Unlike the mail policy

in that case, the policy advanced by Mr. Samuels did not require

the opening and inspection of all outgoing mail.  Instead, as

noted above, the policy simply required the unit staff to make a

cursory examination of the return address on an already sealed

--------------------------------

    [4] The court in Altizer approved this policy for all pieces
of outgoing inmate mail except for communications with an
inmate's attorney.  Such communications, according to the court,
raise the specter of the Sixth Amendment right to counsel and
were not at issue in the case as presented.  Altizer, 191 F.3d at
549 n.14.

envelope to confirm its accuracy and to electronically scan the

envelope for dangerous items.  This policy furthers the

Government's substantial interest in preventing inmates from

sending harmful materials through the mail, and it is narrowly

tailored to the furtherance of this interest.

As the procedures established by the B.O.P. and instituted

by Mr. Samuels clearly meet the requirements for censorship of

outgoing mail established by the Supreme Court in Martinez, they

cannot be seen as a violation of the Plaintiff's First Amendment

right to access to the courts.  Thus on the first prong of the

Saucier test for qualified immunity, which addresses whether the

actions of the Defendant violated the Plaintiff's constitutional

rights, this Court finds that they did not.  The Court having

determined that the Defendant did not violate Plaintiff's

constitutional rights, "there is no necessity for further

inquiries concerning qualified immunity."  Saucier, 533 U.S. at

201.[5]  The Court accordingly finds that the Defendant is entitled

---

[5] The Court notes, however, that even if the Defendant's
policy were found to constitute a violation of the Plaintiff's
First Amendment rights, the Defendant would still be entitled to
qualified immunity, because it would not be "clear to a
reasonable officer that his conduct was unlawful in the situation
he confronted."  Saucier, 533 U.S. at 201-02.
Three sources of law reinforce the reasonableness of Mr.
Samuels' belief that the policy he implemented was lawful.
First, the Supreme Court has shown great deference to the
decisions of prison directors on the day-to-day policies of
prison management in regard to security.  Thornburgh, 490 U.S. at
407-08; Bell, 441 U.S. at 547.  Second, the Third Circuit has
evinced a concern with the use of the mail by prisoners to send

to qualified immunity and will enter summary judgment for the

Defendant in this case.

### III.  CONCLUSION

For the reasons discussed above, the Court will grant the

Defendant's motion for summary judgment.   The accompanying Order

will be entered.

**December 4, 2008**                              **s/ Jerome B. Simandle**
Date                                            JEROME B. SIMANDLE
                                                United States District Judge

---

and receive contraband that could rise to the level of requiring
censorship of outgoing special mail.  Nasir, 350 F.3d at 374.
Finally, in the absence of any direct Third Circuit determination
of the constitutionality of the procedures at issue here, the
Ninth and Fourth Circuits provide persuasive authority by
approving even more intrusive outgoing mail policies than the
policy implemented by Mr. Samuels.  Witherow, 52 F.3d at 266
(Ninth Circuit determined that, prior to inspection, special mail
should not be sealed by the inmate); Altizer, 191 F.3d at 547-48
(Fourth Circuit, differentiating between censorship and
inspection, permitted all outgoing non-legal mail from inmates to
be opened and searched for contraband).  Given this backdrop, a
reasonable warden in Mr. Samuels' position would believe that the
policy set forth in Mr. Vanyun's memo did not violate the First
Amendment rights of inmates and therefore Mr. Samuels would be
entitled to qualified immunity even in the face of a
constitutional violation.